## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
| | ) | **CRIMINAL NO. 2:16-57** |
| v. | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| STEVEN P. GRADOS, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

### I.    Introduction

This case arises from charges that Defendant forged the signature of a Judge of the
United States District Court and committed two counts of mail fraud in an attempt to stop
monthly payments of part of his State Police pension to his ex-wife. Trial in this matter
was held from February 21, 2017, through February 24, 2017. After deliberations, the jury
returned a guilty verdict as to all three counts. Presently before the Court are Defendant's
motion for a new trial and supplemental motion for a new trial based upon the
Government's posing of guilt-assuming hypotheticals to several character witnesses, an
alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963), as well as the additional
argument that the verdict was against the weight of the evidence. (ECF Nos. 49, 51.) For
the reasons explained below, the Court will deny Defendant's motions.

### II.    Background

On March 22, 2016, the grand jury issued a three-count Indictment, charging
Defendant with two counts of mail fraud, in violation of 18 U.S.C. § 1341, and one count

of forging the signature of a Judge of the United States District Court, in violation of 18 U.S.C. § 505. (ECF No. 1.)

The Government alleged that the Defendant, a former Pennsylvania State Trooper, devised a scheme to defraud the organization which manages state pensions, the State Employees Retirement System (SERS), and his ex-wife. (ECF No. 1.) Specifically, it was alleged that he composed a fraudulent opinion and order and forged the signature of the former Chief Judge of the Western District of Pennsylvania, the Honorable Gary L. Lancaster. Judge Lancaster had presided over a civil lawsuit the Defendant previously filed alleging a conspiracy to deprive him of his rights during the divorce proceedings. The fraudulent opinion and order, which the Defendant allegedly mailed to SERS in February of 2014, purports to order SERS to stop paying a portion of his pension to his ex-wife, which had been ordered by an Illinois judge following divorce proceedings between the two. After SERS did not cease payment to his ex-wife, the Defendant sent another copy of the fraudulent opinion and order in May of 2014, along with a handwritten note, which he signed, asking SERS to cease payment pursuant to the order. (Government Exhibit 7.1.)

At trial, the Government called a total of 11 witnesses, including FBI agents, a hand-writing expert, the Defendant's first ex-wife, Karen, her divorce attorney from Illinois, Judge Lancaster's former courtroom deputy and one of his former law clerks. (ECF No. 45.) The Government's most important witness was the Defendant's second wife, with whom he is now estranged, Carlese Grados. Carlese Grados, who received an informal promise of immunity from the Government, testified that she helped the

2

Defendant type the opinion and order while he dictated it to her over the course of several months. She then testified that once he was satisfied, he had her print it out, held it up against the window to trace Judge Lancaster's signature[1], and then, wearing gloves, put it in an envelope. Carlese Grados testified that she and the Defendant then drove to two post offices before the Defendant had her mail the opinion and order to SERS.

The defense theory at trial was that Carlese Grados acted alone and that the Defendant had been set up. As part of his case, the Defendant testified, as did four relatively brief character witnesses. (ECF No. 45.) Defendant testified that he never received a copy of Judge Lancaster's genuine order dismissing the case, and that several years later he received a copy of the fraudulent order in the mail. Defendant denied mailing the first copy of the fraudulent order to SERS in February 2014, but admitted he sent the order to SERS the second time in May 2014, thinking it was genuine and thus that he was entitled to have payments from his pension to his ex-wife stopped.

On February 24, 2017, after a four-day trial, a jury found Defendant guilty of all three counts. (ECF No. 43.) Defendant now moves for a new trial pursuant to Federal Rule of Criminal Procedure 33. (ECF Nos. 49, 51.) Defendant's motion and supplemental motion make three principle arguments. (1) That the prosecution committed misconduct by asking several defense witnesses guilt-assuming hypotheticals which Defendant avers resulted in substantial prejudice. (2) That the jury's verdict was against the weight of the

---

[1] Following the ruling of the divorce court in Illinois, Defendant, pro se, filed a civil lawsuit in this Court naming his first ex-wife, her divorce attorney, his divorce attorney, and the Illinois judge as defendants. That lawsuit was dismissed by Judge Lancaster in late 2011. (Case No. 2:11-cv-935.) The forged opinion and order listed the case number from Defendant's real lawsuit with the addition of the letter "B" following the numbers.

3

evidence based on purported inconsistencies between Carlese Grados's testimony and other evidence in the case. (3) That the prosecution committed a *Brady* violation in failing to turn over the original order sent to SERS. The motions have been fully briefed and are now ripe for disposition. (ECF Nos. 50, 51, 54, 55, 56.)

## III.    Applicable Law

### A.    Motion for a New Trial, Rule 33

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Pursuant to this rule, a District Court can order a new trial if the jury's verdict is contrary to the weight of evidence. *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014). A court evaluating a Rule 33 motion "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Rule 33 motions "are not favored and should be 'granted sparingly and only in exceptional cases.'" *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). A new trial should be granted on the grounds that the jury's verdict was against the weight of the evidence only where the court "believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." *Salahuddin*, 765 F.3d at 346 (quotations and citations omitted).

**B.    Motion for a New Trial, *Brady v. Maryland*, 373 U.S. 83 (1963)**

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the Government must provide a defendant with exculpatory material, including impeachment material, that it either possesses or could obtain through due diligence. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 155 (1972). To establish a *Brady* violation sufficient to warrant a new trial, "a defendant must show: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment." *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005). The failure to provide such evidence is a violation of due process, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

Evidence is not suppressed if the defendant could have obtained it "from other sources by exercising reasonable diligence" or "either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991); *see also Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009) ("The purpose of *Brady* is not to require the prosecution to disclose all possibly favorable evidence to the defense but to make certain that the defendant will not be denied access to evidence which would ensure him a fair trial.").

If the Government suppressed evidence favorable to the defendant, the defendant must also demonstrate that the evidence is material. *Pelullo*, 399 F.3d at 209. Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995). Reasonable probability is "a probability sufficient to undermine

confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35. A showing of materiality therefore "does not require demonstration by a preponderance that disclosure . . . would have resulted ultimately in the defendant's acquittal." *Id.* at 435. Rather, the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* In determining whether the defendant has established materiality, a court must evaluate the cumulative effect of the undisclosed evidence. *Id.* at 436-37.

When "reliability of a given witness may well be determinative of guilt or innocence," the nondisclosure of evidence affecting credibility, or impeachment evidence, falls within the scope of *Brady*. *See Giglio*, 405 U.S. at 154 (internal quotations omitted). Accordingly, "[m]aterials that must be disclosed are those . . . that might affect the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Hill*, 976 F.2d 132, 134-135 (3d Cir. 1992).

## III.  Discussion

### A.  Defendant's Motion for a New Trial Pursuant to Rule 33

Defendant argues that the jury's verdict was against the weight of the evidence based upon purported inconsistencies between Carlese Grados's testimony and other evidence. (ECF No. 50 at 13-15.) Although not fully fleshed out, it appears Defendant is

6

arguing the following. If the Government is correct and Carlese Grados told the truth, the fact that the Defendant mailed a copy of the fraudulent opinion and order in May of 2014 shows that he must have made a copy of the fraudulent opinion and order on which he forged Judge Lancaster's signature before it was mailed in February of 2014. This, Defendant argues, is inconsistent with Carlese Grados's testimony. Defendant characterizes her testimony as indicating that the Defendant did not in fact make a copy after forging Judge Lancaster's signature. (*Id.* at 14) ("In her immunized statement, and in her subsequent testimony, Carlese Grados, posited that Mr. Grados forged the signature of Judge Gary Lancaster and then placed that document into an envelope and sealed it.".) Defendant avers this demonstrates that the testimony was untruthful and because the testimony of Carlese Grados was of central importance to the Government's case, that the jury's guilty verdict was against the weight of the evidence.

In response, the Government argues that Defendant mischaracterizes Carlese Grados's testimony, that defense counsel never even cross-examined her on the issue, and that the jury had a sufficient opportunity to consider the possibility of an inconsistency before ultimately rejecting it. (ECF No. 54 at 12-13.)

As already discussed, the standard for granting a new trial on grounds that the verdict was against the weight of the evidence is extremely high. *Salahuddin*, 765 F.3d at 346 (quotations and citations omitted) (only to be granted where the court "believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted"); *Silveus*, 542 F.3d at 1005 (Rule 33 motions "are not favored and should be 'granted sparingly and only in exceptional cases.'"). After review

7

of the record and the parties' arguments, the Court does not find this to be an exceptional case or believe that there is a serious danger that a miscarriage of justice has occurred.

The Court concurs with the Government that Defendant mischaracterizes Carlese Grados's testimony. On direct examination, the Assistant United States Attorney (AUSA) asked Carlese Grados in detail about typing the opinion and order for the Defendant.[2] Carlese Grados then explained how at her husband's direction they both wore gloves when handling the document. The AUSA then asked what the Defendant did when she had finished typing and printed the document. A back and forth between the AUSA and Carlese Grados ensued wherein she described Defendant's tracing of the signature against a window. From there the AUSA went straight into asking about the process of mailing the February 2014 fraudulent opinion and order. While Carlese Grados did not testify that the Defendant made a copy after tracing Judge Lancaster's signature and before placing the document in the envelope to mail, she also did not testify that making a copy did not occur. Rather, the AUSA simply did not ask about it.

Similarly, and even more damaging to Defendant's position, his attorney did not ask Carlese Grados whether or not her husband made a copy of the order on cross-examination. The cross-examination went through printing the order, the Defendant tracing the signature against the window, then to putting the order in the envelope, and then to mailing it. Defendant's attorney did not ask Carlese Grados specifically if his client copied the letter after he signed it, nor did he ask more generally if the Defendant

---

[2] Because the parties did not request preparation of the transcript, the Court had an unofficial transcript prepared as to portions of the trial relevant to the pending motions only.

did anything else with the order between signing it and placing it in the envelope.[3] Therefore, the suggestion that the Defendant must have made a copy of the fraudulent opinion and order, even if correct, does not directly contradict Carlese Grados's testimony. She may have simply failed to include this action when responding to other questions and both attorneys declined to follow up on the issue.

The Court further notes that even if Carlese Grados had testified that the Defendant mailed, what Defendant calls the wet copy[4], in February and did not make another copy, it would not necessarily disprove Carlese Grados's testimony or the Government's case. Any number of things could have happened. For example, the Defendant could have easily printed the fraudulent opinion and order at a later date and forged the signature again. Or Carlese Grados could have simply not noticed Defendant making a copy – she did testify it took him several minutes to trace Judge Lancaster's signature and that at times she tried not to watch. The point is, while the issue of copying or not copying the order and the mailing of the wet copy is arguably an inconsistency in the Government's case and Carlese Grados's testimony, it is not necessarily fatal to either.

Few cases are perfect. It is the jury's duty to evaluate the deficiencies that defense attorneys allege to exist in the Government's evidence and determine whether the defendant has been proved to be guilty beyond a reasonable doubt. Likewise, it is up to the factfinder, in this case the jury, to determine credibility. *See, e.g., United States v. Kole,*

---

[3] The Court notes that rather than this being an inadvertent omission, the cross-examination by defense counsel may have been a deft attempt to create an inconsistency to argue during his closing without risking actually asking the witness about it.

[4] The term wet copy refers to the actual document that was physically signed in ink, as opposed to a photo copy.

9

164 F.3d 164, 177 (3d Cir. 1998). Here, Defendant's attorney very ably explained this possible inconsistency to the jury in his closing argument. The jurors were presented with Defendant's theory, had a full opportunity to consider it, and ultimately decided it did not constitute reasonable doubt as to the Defendant's guilt.

To be sure, the Government's case at trial left unanswered questions as to how the two sets of opinions and orders allegedly sent by the Defendant related to each other. Nevertheless, Carlese Grados's testimony was not necessarily inconsistent, defense counsel did not actually ask her about the inconsistency, there are other possible explanations, and the jurors had the opportunity to evaluate the possible inconsistency for themselves. For these reasons, the Court finds that the jury's verdict was not against weight of the evidence and that a new trial is not warranted.

**B.    Defendant's Supplemental Motion for a New Trial Pursuant to *Brady***

As discussed above, the Government must provide a defendant with exculpatory material, including impeachment material, that it either possesses or could obtain through due diligence. *See Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 155. To establish a *Brady* violation sufficient to warrant a new trial, "a defendant must show: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment." *Pelullo*, 399 F.3d at 209.

Defendant also premises his *Brady* argument on the same issue regarding the wet copy of the February 2014 order and the lack of testimony indicating he made a copy of it prior to mailing. At trial, the Government did not produce the original fraudulent

opinion and order received by SERS in February 2014. Instead, FBI agents testified that they only received copies from SERS. Counsel for Defendant avers that after the trial, on March 3, 2017, he sent a Pennsylvania Right to Know Request to SERS requesting the original. (ECF No. 51 at 1.) The letter from SERS in response indicated that SERS no longer had the original because it "was provided to federal investigators." (*Id.* at 4.) Accordingly, Defendant now argues that this evidence was suppressed by the Government and that it was potentially exculpatory for reasons relating to the issue of whether or not it was the wet copy, which bears on whether or not Defendant made a copy. (ECF Nos. 51, 55.)

In response, the United States avers that they never received the original and thus did not suppress it and that even if they had, it would not be material. With respect to suppression, the Government produced a letter dated November 15, 2015, in which SERS states that in response to a grand jury subpoena for documents relating to Steven Grados, they were turning over "copies" of all correspondence from Mr. Grados and the original envelope sent in May 2014. (ECF No. 54-2.) SERS does not mention that it is turning over the original of either fraudulent order. (*Id.*) The Government also avers that SERS supplemented its response to defense counsel and stated that "upon further review, we have been unable to determine whether the Order SERS provided to federal investigators was the actual document submitted to SERS or a scanned and reprinted copy thereof." (ECF No. 54 at 15-16.)

First, the Court finds that the original fraudulent opinion and order was not suppressed. This case presents a somewhat unusual situation in that it is not clear

11

whether or not the Government even has or ever had the alleged *Brady* evidence. Although the letter sent by SERS to defense counsel raises questions as to whether the original fraudulent opinion and order was turned over to the Government, viewed as a whole, the record is not sufficient to allow the Court to conclude that the original was suppressed. First, there are the representations of the FBI agents that they never received the original from SERS. Second, there is the letter from SERS received by the Government on November 15, 2015, which supports the FBI agents' position. (ECF No. 54-2.) Third, there is the claim by the Government that SERS has since amended its statement to defense counsel to indicate that SERS is not sure if it was the original or a copy that it turned over to federal investigators. (ECF No. 54 at 15-16.) While the Government does not attach any supporting documentation for this proposition, Defendant declined to dispute the assertion in his subsequent reply brief. (*See generally*, ECF No. 55.) At trial, the attorney at SERS who reviewed the opinion and order and concluded it looked suspicious, Jill Vecchio, testified that she had reviewed the order on her computer only and that the original was probably taken to SERS's archives after it was scanned into their system. The location of the original opinion and order remains a mystery. However, when the information available is taken as a whole, the Court cannot conclude that it is or was in the possession of the Government. If the Government does not have and never had a piece of evidence, it could not have suppressed it and thus it could not have committed a *Brady* violation.[5]

---

[5] The Court acknowledges that *Brady* applies to both evidence that the Government actually possesses and evidence which the Government could have obtained through due diligence. Here, the Government requested from SERS documents relating to the Defendant's alleged fraud (ECF

Although the conclusion that there was no suppression means that Defendant's request for a new trial pursuant to *Brady* fails, the Court will discuss the other two elements for the sake of completeness.

With respect to the second element, the Court finds that the original letter is favorable to the Defendant. As the Defendant points out, the possibility of SERS receiving the wet copy in February 2014 does support an arguable inconsistency in Carlese Grados's testimony. Since Carlese Grados was the most important Government witness, the original February 2014 opinion and order received by SERS is favorable to the Defendant.

Third, although the original would have been favorable to the Defendant, the Court cannot conclude that it was material. As discussed above, evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 434-35. Reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35. A showing of materiality therefore "does not require demonstration by a preponderance that disclosure . . . would have resulted ultimately in the defendant's acquittal." *Id.* at 435. Rather, the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* In determining

---

54-2), and SERS appears to either not have, or not be able to find the original document that it received in February 2014. Accordingly, the Court concludes both that the Government exercised due diligence and that the evidence in question could not have been obtained through due diligence.

whether the defendant has established materiality, a court must evaluate the cumulative effect of the undisclosed evidence. *Id.* at 436-37.

As explained above, the importance of the wet copy and the possible inconsistency in Carelese Grados's testimony is much more limited than Defendant suggests. To summarize: Carlese Grados did not actually testify that the Defendant did not make a copy and counsel for Defendant declined to directly cross-examine her on the subject, there are other possible explanations for the purported inconsistency, and defense counsel ably presented the possible inconsistency to the jury which ultimately decided to reject it. What is more, having the original February 2014 order at trial would not have made a significant difference in establishing the possible inconsistency. Defendant stakes the inconsistency argument on the idea that under the Government's theory, there must have been a copy made of the order Defendant forged in February 2014 since he mailed a copy of same two months later. Even accepting this inconsistency argument as true, whether or not SERS received the wet copy in February 2014 is almost irrelevant. If SERS did receive the wet copy in February 2014, then there is a possible inconsistency with Carlese Grados's testimony as to where Defendant got the copy he mailed in May 2014. If, on the other hand, the document SERS received in February 2014 was not the original, then that document was a photocopy and Defendant still must have made a copy at some point. This possible inconsistency was there for the defense to argue even in the absence of the actual document received by SERS. Having it, and knowing if it was the wet copy, would not have significantly advanced the argument.

14

The Court recognizes that "the standard for granting a motion for a new trial pursuant to Rule 33 is more rigorous than the standard for granting a motion for a new trial based on a *Brady* violation." *United States v. Isaac*, 22 F. Supp. 3d 426, 434 (E.D. Pa. 2014). However, the Court cannot conclude, based upon the relationship between the original fraudulent opinion and order and Carlese Grados's testimony that this evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In making this determination, the Court has evaluated the cumulative effect of the original, which was possibly the wet copy, on each count to which Defendant has been convicted. *See Kyles*, 514 U.S. at 436-37. Accordingly, because Defendant has failed to establish that production of the original order received by SERS in February 2014 was material either to guilt or to punishment, the Court must deny Defendant's motion for a new trial based upon the Government's alleged *Brady* violation. *See, e.g., Rivera v. Commonwealth of Pennsylvania*, 187 Fed. Appx. 240, 247 (3d Cir. 2006) ("'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense.'") (quoting *United States v. Agurs*, 427 U.S. 97, 109-110 (1976)); *Pelullo*, 14 F.3d at 886-87 (finding that an IRS interview memorandum, which set forth facts inconsistent with a key witness's trial testimony, qualified as *Brady* evidence because it revealed some inconsistencies between the trial testimony and the interview report but denying motion for a new trial because the memorandum would not have changed the outcome of the trial); *Isaac*, 22 F. Supp. 3d at 434 (finding that the Government had failed to disclose evidence favorable to the defense but concluding that

15

the evidence did not satisfy the third prong of a *Brady* violation because "given the other corroborating testimony, it is unlikely the new records would have impacted the entire trial").

### C.    Guilt-Assuming Hypotheticals

Defendant's other argument in favor of a new trial is based upon the AUSA's asking of guilt-assuming hypotheticals to two of Defendant's character witnesses.

At trial, Defendant called four character witnesses, including Carol Pore and Christopher Bardi.  On cross-examination, the AUSA asked Ms. Pore "[i]f you knew that the Defendant had lied under oath in a criminal trial, would that affect your opinion as to whether or not he was a truthful person?"  Defendant did not object to this question, and Ms. Pore answered.  The AUSA next began asking Ms. Pore "I want you to assume for a moment that the Defendant forged the signature of a federal judge on a document that was designed to cut off his ex-wife's share of his pension –" and was interrupted by an objection from defense counsel. At sidebar, defense counsel asked for a mistrial.  The Court denied the request for a mistrial but sustained the objection and told the jury to disregard the question.  Mr. Bardi testified next.  On direct examination he testified that the Defendant was a good friend and that his character was impeccable.  On cross-examination, the AUSA asked Mr. Bardi "[i]f you were told that Mr. Grados had lied under oath in a criminal trial, would that information impact your opinion concerning Mr. Grados's truthfulness?"  Defendant objected to this question, although the witness also continued to answer the question in the negative.  After a sidebar discussion, the Court sustained the objection and told the jury to disregard both the question and the

answer. Defendant did not request a mistrial during Mr. Bardi's testimony. Defendant subsequently called two other character witnesses who testified without similar incident.

Defendant argues that these hypotheticals constituted prosecutorial misconduct and were unfairly prejudicial.[6] In response, the Government argues that its questions were proper and that even if they were improper they constituted only harmless error.

While other Circuits differ slightly in their handling of guilt-assuming hypotheticals, the Third Circuit Court of Appeals has held that while it is improper to ask a reputation character witness such questions, there is no bright-line rule regarding guilt-assuming hypotheticals asked to opinion character witnesses:

> As to cross-examination of opinion character witnesses, however, while we recognize that a question like the one posed by the government in this case may prove problematic if it arises in circumstances that implicate the presumption of innocence or otherwise undermine due process, such circumstances are a possibility and by no means a certainty. In our view, there is nothing inherent in guilt-assuming hypotheticals, in the abstract, that makes them unfairly prejudicial, let alone so prejudicial as to constitute a per se violation of due process. We therefore see no need to adopt a bright-line rule prohibiting a potentially probative type of inquiry. Generally speaking, a person testifying regarding a present opinion should be open to cross-examination on how additional facts would affect that opinion. In the context of opinion character testimony cross-examination about the charged crime tests "both the witness' bias and the witness' own standards by asking whether the witness would retain a favorable opinion of the defendant even if the evidence at trial proved guilt." *Oshatz*, 912 F.2d at 544 (Mukasey, J., concurring). Such evidence may aid in the jury's ultimate credibility determinations and in deciding how much weight to give to a defendant's character evidence.

*United States v. Kellogg*, 510 F.3d 188, 196 (3d Cir. 2007); *see also United States v. Furst*, 886 F.2d 558, 577 (3d Cir. 1989) ("When on direct examination a witness is asked to express his

---

[6] The Court notes that Defendant's main brief only mentions Mr. Bardi. Only in his reply brief, does Defendant note that he omitted Ms. Pore's name from his original brief.

current opinion as to relevant characteristics of the defendant, cross examination may include questions relating to acts up to the time the witness testifies.") (citations omitted). In evaluating whether improper remarks by a prosecutor justifies granting a new trial, courts "must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant[s]." *United States v. Berrios*, 676 F.3d 118, 135 (3d Cir. 2012) (citations omitted).

Although there is no formal test, there are a number of factors that the Court of Appeals has looked at in evaluating whether a guilt-assuming hypothetical was permissible. These include: whether the "hypothetical nature was so emphasized as to allay any real concern about undermining" the presumption of innocence; the number of questions and number of witnesses asked those questions in relation to the length of the trial as a whole; whether it is a case "where the jury "repeatedly hear[d][the] prosecutor assure [the] trial judge that he ha[d] a good faith basis for asking permitted hypothetical questions" and thus "infer[red] ... that the prosecutor ha[d] evidence of guilt beyond the evidence in the record"; and whether "the case involved a swearing contest between the defendant and a key government witness." *Id.* at 196-97 (citations omitted).

Upon review of the record, the case law, and the parties' arguments, the Court concludes that while at least one of the questions may have arguably been improper, it did not result in significant prejudice to the Defendant and thus constituted harmless error and is not grounds for a new trial. The Court notes first that both Ms. Pore and Mr. Bardi testified to their opinion of the Defendant's character rather than the Defendant's

reputation. Thus, asking guilt-assuming hypotheticals is at least potentially permissible. Second, while potentially still prejudicial, two of the three hypotheticals, those which asked Ms. Pore and Mr. Bardi to assume that the Defendant had committed perjury, do not implicate the presumption of innocence concerns in the same way that a true guilt-assuming hypothetical does, because they did not assume the Defendant's guilt as to the crimes for which he was on trial.

Some of the other factors looked at by the Court of Appeals cut both ways. With respect to the hypothetical nature of the questions, the Government plainly stated that they were hypotheticals, but did not emphasize the hypothetical nature significantly beyond that. However, this is not a case "where the jury "repeatedly hear[d][the] prosecutor assure [the] trial judge that he ha[d] a good faith basis for asking permitted hypothetical questions" and thus "infer[red] ... that the prosecutor ha[d] evidence of guilt beyond the evidence in the record." Rather, the jury never heard either AUSA make such assertions as all discussions of the objections took place at sidebar. A total of three questions were asked to two witnesses during a four-day trial. While not nearly as long as the three-week trial in *Kellogg*, the guilt-assuming hypotheticals and the entirety of the testimony of the witnesses they were posed to, represented a very small portion of the trial. Defendant called two other character witnesses who were not asked such questions.[7]

---

[7] The Court would further note that the testimony of each of the four character witnesses was extremely brief. And while they all vouched for the Defendant's character generally, there was little substance to any of their testimony. One of four actually indicated that he based his opinion in large part on the fact that the Defendant "keeps up the yard" in their "nice neighborhood."

19

Defendant argues that this case was "a swearing contest between the defendant and a key government witness," and thus that the hypotheticals were particularly prejudicial. To be sure, Carlese Grados's testimony was very important to the Government's case, and her testimony, which was contradicted by the Defendant's, was the only direct evidence that he had directed her to help him in preparing the fraudulent order. However, the Court would not describe the case as coming down solely to the Defendant's word against that of Carlese Grados.[8] The Government offered considerable evidence as to the Defendant's motive spanning the divorce proceeding, through the lawsuit he filed in this Court, through the receipt of the fraudulent opinion and order by SERS, which suggested a long-running obsession with protecting and then reclaiming the full value of his pension. The Government also elicited testimony regarding similarities between the fraudulent opinion and order and Defendant's *pro se* filings in his civil case before Judge Lancaster. Therefore, while the Defendant's credibility was an important issue in the case, it was not a pure "swearing contest."

Perhaps most importantly, however, this case differs from others in which the Court of Appeals has found a new trial to be warranted based on the use of guilt-assuming hypotheticals in that those cases typically involved the District Court allowing the Government to ask the questions over the objections of the defendants. Here, the Defendant did not object at all to the first question asked of Ms. Pore and the Court sustained Defendant's objections to the other two questions and instructed the jury to

---

[8] Or the Defendants word against that of the two FBI agents with respect to which orders the Defendant showed them when they first went to his house to interview him.

20

disregard. *See United States v. Chukwuma*, 454 F. App'x 56, 60 (3d Cir. 2011) (finding no abuse of discretion for denial of a mistrial based on "isolated" comment by the prosecutor in part because "the District Court took appropriate steps to instruct the jury to disregard the comment.").

For these reasons, the Court concludes that even if the questions posed by the AUSA's constituted improper guilt-assuming hypotheticals, any error was harmless. Accordingly, the Defendant is not entitled to a new trial.

## IV.    Conclusion

For the foregoing reasons, the Court concludes that Defendant is not entitled to a new trial, and will therefore deny Defendant's motions.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | **CRIMINAL NO. 2:16-57** |
| v. | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| STEVEN P. GRADOS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this 6th day of July, 2017, upon consideration of Defendant's Motions for a New Trial (ECF Nos. 49, 51), the briefs submitted (ECF Nos. 50, 54, 55, 56), and the trial record, and in accordance with the forgoing memorandum opinion, **IT IS HEREBY ORDERED** that Defendant's motions are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's sentencing remains scheduled for **July 21, 2017, at 10:00 a.m. in Courtroom 9A, Joseph F. Weis, Jr. U.S. Courthouse, 700 Grant Street, Pittsburgh, Pennsylvania.**

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**